**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRANDON RUDOLPH KIMBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 22 CV 02717** |
| vs. | ) | |
| | ) | |
| ROUNDY'S ILLINOIS, LLC | ) | **Hon. Mary M. Rowland** |
| d/b/a MARIANO'S, | ) | |
| | ) | |
| Defendant. | ) | |

**RULE 56(c)(1) SEPARATE STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Defendant, Roundy's Illinois, LLC d/b/a Mariano's ("Defendant," "Mariano's" or the "Company"), pursuant to Fed. R. Civ. P. 56(c)(1) and Local Rules 56.1(a)(2) and 56.1(d), respectfully submits this Separate Statement of Undisputed Facts ("SSUF") and accompanying Appendix of Exhibits ("APP'X") in support of its Motion for Summary Judgment and supporting Memoranda of Law.

**A. PARTIES, JURISDICTION AND VENUE**

1. Plaintiff is an individual residing in Chicago, Illinois, who was previously employed by Defendant Roundy's Illinois, LLC d/b/a Mariano's, as a "Level 3" hourly employee in the Meat-and-Seafood Department at the Company's retail grocery store located at 1615 South Clark Street in Chicago, Illinois (colloquially referred to as "Store No. 512"). [**APP'X @ A:** Pl. Dep. Tr., p. 30, line 3-5, p. 69, line 1 – p. 71, line 4; **APP'X @ A-1:** Dkt. No. 22, p. 1, ¶¶ 1-4].

2. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331, because Plaintiff's Complaint alleges claims for:

- Employment Discrimination based on color, race, and national origin under 42 U.S.C. § 1981;

- Hostile Work Environment, based on color, race, and national origin under 42 U.S.C. § 1981; and

- Employment Retaliation, based on color, race, and national origin under 42 U.S.C. § 1981.

According to Plaintiff:

Q:    I've just handed you what I've marked as Deposition Exhibit 1.

(Rudolph-Kimble Deposition Exhibit 1 marked for identification and attached to the transcript.)

Q:    Have you seen this document before?

A:    Yes, I have.

Q:    This is the amended complaint that you filed in this lawsuit, correct?

A:    Yes.

Q:    And in this complaint, you allege that Mariano's discriminated against you based upon your race and color in violation of Title VII and Section 1981, correct?

A:    Yes.

Q:    You also allege that Mariano's discriminated against you based on your national origin in violation of Title VII and Section 1981, correct?

A:    Yes.

Q:    And you previously alleged in this lawsuit that Mariano's discriminated against you on the basis of your sex in violation of Title VII, correct?

A:    Yes.

Q:    And you also allege that Mariano's retaliated against you for seeking a promotion, correct?

A:    Yes.

Q:    And the adverse employment action that you claim you suffered here was that your employment was terminated, correct?

A:    Yes.

Q:    And you understand that Mariano's terminated your employment based upon your background check revealing a criminal conviction record, correct?

A:    That was a part of all the other claim under the 1981 section of civil rights as well, yes.

Q:    Okay. And you believe that the company violated the Ban the Box Law because you said the company didn't give you an opportunity to review and explain your situation, correct?

A:    I never received my five-day noticing, so that's against the law as well. And then being terminated in lieu of a background – criminal background dispute is illegal in the state of Illinois as well. So, yes.

Q:    And you understand that that was why you were terminated, correct?

A:    I do know that that was a part of it, as well as this complaint under 1981 section of civil rights that I complained about as well, yes.

Q:    You also allege that Crystal Brandon, who was a people's service manager or PSM at the store you worked at, made certain lewd comments about you, correct?

A:    Yes.

Q:    And, finally, you allege that you were not allowed to apply for a management position, correct?

A:    I don't understand the question. Reiterate that question again.

Q:    Sure. I believe – if I understand your allegations, one of them is that you were denied the ability to apply for a promotion; is that accurate or –

A:    Yes, that is.

3

[**APP'X @ A:** Pl. Dep. Tr., p. 15, line 19 – p. 18, line 15; **APP'X @ A-1:** Dkt. No. 22, pp. 2-6, ¶¶ 5-16].

3.      Venue is proper in this District because Plaintiff was employed at the Mariano's store located in Chicago, Illinois – also known as "Store No. 512" – when (and where) the material events at issue in this case occurred.  [**APP'X @ A:** Pl. Dep. Tr., p. 69, line 1 – p. 70, line 6; **APP'X @ A-1:** Dkt. No. 22, p. 1, ¶¶ 1-4].

### B.  <u>ABOUT MARIANO'S CONTINGENT HIRING POLICY</u>

4.      As part of its regularly-conducted business activities, Mariano's performs a thorough background check on any employee who expressly (in writing) authorizes the Company to conduct such an investigation.  [**APP'X @ A-16:** Declaration of Lindsay Flesher ("L. Flesher Decl."), at pp. 4-5, ¶ 11; *see also*, **APP'X @ A:** Pl. Dep. Tr., p. 111, line 20 – p. 113, line 5 (Plaintiff never worked in Mariano's human resources ("HR") department, and has never reviewed or received any of the Company's policies and procedures with respect to criminal background check reports)].

5.      As part of Mariano's employment application process, a candidate is asked if they are willing to authorize the Company to perform (directly or through an authorized agent) a background check after their employment has begun.  [*Id.*].

6.      Under this process, the employment candidate must sign an "Offer Acceptance Acknowledgement" document that states, in part, "The Company, at its sole discretion, may elect in certain circumstances to have a candidate begin working in his/her intended role prior to receiving the results from his/her background check and/or drug screen.  In the event that the Company elects to do that, it may nonetheless terminate any individual who the Company learns has not attained satisfactory results on his/her background check and/or drug screen." [*Id.*].

7.     The Offer Acceptance Acknowledgement also identifies the third-party consumer reporting agency – specifically, General Information Systems, or "GIS," a "HireRight" Company – who will perform the background check.  [*Id.*].

### C. Plaintiff's Contingent Hiring and Criminal Background Check Results

8.     In this case, Mariano's extended an offer of conditional employment to Plaintiff to work as a "Level 3" team member in the Meat Department at Mariano's Store No. 512 ("Store 512") located at 1615 South Clark Street in Chicago, Illinois, subject to his completion of a satisfactory background check.  [**App'x @ A-16:** L. Flesher Decl. at p. 5, ¶ 12].

9.     On January 26, 2022, Plaintiff accepted Mariano's offer of conditional employment, agreed to a background investigation, and elected to begin his employment with the Company prior to receiving the results of his background check – with the express understanding that Mariano's may nonetheless terminate his employment if the Company were to learn that he did not attain a satisfactory result on his background check:

[**APP'X @ A-16, Ex. D:** L. Flesher Decl. at Ex. D, at "D000095" (emphasis added); *see also*, L. Flesher Decl. at p. 5, ¶ 13, and pp. 13-14 at ¶ 48 (establishing that Exhibit D is a "business record[] of Mariano's that [was] created on or about the date identified on the respective document from information transmitted by persons with knowledge, and [was] created, kept and maintained in the course and as part of the regular practice of the Company's regularly-conducted business activities"); **APP'X @ A:** Pl. Dep. Tr., p. 78, line 23 – p 79, line 7; p. 86, lines 7-9; **APP'X @ A-12:** Pl. Dep. Ex. 12, at D000095].

10.     Following his January 26, 2022, acceptance of Mariano's contingent offer of employment, Plaintiff's first day of work at Mariano's Store No. 512 was February 8, 2022. [**APP'X @ A-16:** L. Flesher Decl. at p. 6, ¶ 14; *see also*, **APP'X @ A:** Pl. Dep. Tr., p. 83, lines 10-12].

11.     On January 31, 2022, Mariano's submitted to GIS its request for a background check on Plaintiff.  [**APP'X @ A-16:** L. Flesher Decl. at p. 6, ¶ 15; *see also*, **APP'X @ A:** Pl. Dep. Tr., p. 86, line 10 – p. 88, line 8 (Plaintiff admits he has no knowledge of who performed the background check on him, or when the Company received its results)].

12.     On February 28, 2022, Mariano's received from GIS the results of the background check that was performed on Plaintiff. [*Id.*].

13.     The background check results provided by GIS to Mariano's revealed that Plaintiff had been convicted of a crime involving dishonesty – specifically, the criminal offense of "Unlawful To Alter/Sell/Exchange Tokens, Transfers, Transaction Cards, Etc. Without Consent" – on August 10, 2018.  [**APP'X @ A-16:** L. Flesher Decl. at p. 6, ¶ 16; *see also,* **APP'X @ A-16, Ex. F:** L. Flesher Decl. at Ex. F, at D000110-114, and L. Flesher Decl. at pp. 13-14, ¶ 48 (establishing that Exhibit F is a "business record[] of Mariano's that [was] created on or about the

date identified on the respective document from information transmitted by persons with knowledge, and [was] created, kept and maintained in the course and as part of the regular practice of the Company's regularly-conducted business activities"); **App'x @ A:** Pl. Dep. Tr., p. 57, line 13 – p. 58, line 21 (authenticating Pl. Dep. Ex. 7 as copy of Plaintiff's background check results, and affirming accuracy of its contents)].

14.     In accordance with its policies and procedures, Mariano's sent written notice of the unsatisfactory background results, along with a copy of the background report itself and a summary of consumer protection rights under the Fair Credit Reporting Act (collectively, the "Adverse Notice"), to Plaintiff on February 28, 2022, inviting him to "dispute the accuracy or completeness of any information contained in the [background check] report" by contacting HireRight and providing Mariano's with whatever additional information Plaintiff deemed relevant.  [**App'x @ A-16:** L. Flesher Decl. at p. 6, ¶ 17; *see also,* **App'x @ A-16, Ex. G:** L. Flesher Decl. at Ex. G, at D000115-127 and L. Flesher Decl. at pp. 13-14, ¶ 48 (establishing that Exhibit G is a "business record[] of Mariano's that [was] created on or about the date identified on the respective document from information transmitted by persons with knowledge, and [was] created, kept and maintained in the course and as part of the regular practice of the Company's regularly-conducted business activities")].

15.     The Adverse Notice that was sent to Plaintiff on February 28, 2022, was addressed to Brandon Rudolph-Kimble at 310 South Halsted Street, Chicago, Illinois 60661 – which Plaintiff acknowledges was the correct mailing address for him at that time.  [**App'x @ A-16, Ex. G:** L. Flesher Decl. at Ex. G, at D000115; **App'x @ A:** Pl. Dep. Tr., p. 30, line 3 – p. 31, line 5].

16.     While Plaintiff contends he did not ***receive*** the Adverse Notice until after his employment had been terminated, Plaintiff concedes the Company may have ***sent*** the Adverse

Notice to him, and he simply did not receive it in a timely manner. [**App'x @ A:** Pl. Dep. Tr., p. 108, line 15 – p. 110, line 24].

### D. MARIANO'S TERMINATION OF PLAINTIFF'S EMPLOYMENT

17. Lindsay Flesher is the "Associate Relations Manager" at Mariano's, a role in the Company's human resources ("HR") department that she has held continuously since May 9, 2021. [**App'x @ A-16:** L. Flesher Decl. at pp. 1-2, ¶ 3].

18. In her capacity as an HR professional and the Associate Relations Manager at Mariano's, Ms. Flesher's job functions include, among other things, "[t]he review, analysis, and adjudication of negative associate background checks in accordance with Company guidelines, including decisions to terminate and/or suspend employment based on contingent hiring holds;" and, in this case, Ms. Flesher reviewed the Plaintiff's background check results from GIS. [*Id.,* at p. 3, ¶ 4(h)].

19. At Mariano's, "honesty" and "integrity" are considered core Company values, expected of every Mariano's employee. [*Id.,* at p. 6, ¶ 18].

20. Because honesty and integrity are core values at Mariano's, and because Plaintiff had not challenged the accuracy of his background check report or provided any information concerning the facts and circumstances leading to his conviction for a crime of dishonesty, Ms. Flesher determined that continuing Plaintiff's employment would involve an unreasonable risk to property at Mariano's and, solely on that basis, Lindsay Flesher made the decision to terminate Plaintiff's employment with the Company on March 9, 2022. [*Id.*].

21. Lindsay Flesher was the sole decision-maker with respect to Mariano's decision to terminate Plaintiff's employment with the Company; no other person was involved with or

participated in the decision-making process that resulted in Plaintiff's termination of employment. [*Id.,* at p. 7, ¶ 20].

22.    On March 15, 2022, Crystal Brandon, the People Services Manager ("PSM") for Store No. 512, informed Plaintiff of Ms. Flesher's decision to terminate his employment. [*Id.,* at ¶ 19].

23.    Importantly, Crystal Brandon's role with respect to Plaintiff's separation of employment was strictly limited to informing Plaintiff of Ms. Flesher's decision to terminate his employment; Ms. Brandon did not participate in the decision-making process, and played no role whatsoever in the decision to terminate Plaintiff's employment.  [*Id.,* at ¶ 21].

24.    Lindsay Flesher based her decision to terminate Plaintiff's employment solely on the fact that he had been convicted of a crime of dishonesty, as reported on his criminal background report, and not on any other factor; when reviewing Plaintiff's background investigation report and making her termination decision, Ms. Flesher did *not* consider Plaintiff's race, color, national origin, or any other factor.  [*Id.,* at ¶ 22].

25.    Moreover, when making her decision to terminate Plaintiff's employment, Ms. Flesher was not aware of his race, color or national origin at that time; Ms. Flesher did not learn that Plaintiff self-identified as "black" or "African-American" until he wrote to the Company's HR Department ***after*** his employment had already been terminated.  [*Id.*, at ¶ 23, ¶¶ 38-39].

26.    Similarly, when making her decision to terminate Plaintiff's employment, Ms. Flesher was not aware of any facts that would suggest that he had requested or applied for any type of promotion or certification; she did not learn about Plaintiff's allegations concerning a requested promotion or certification until he wrote to the Company's HR Department ***after*** his employment had already been terminated.  [*Id.*, at ¶ 24, ¶¶ 38-39].

27.    Neither Plaintiff's race, nor his color, nor his national origin played any role whatsoever in Ms. Flesher's decision to terminate his employment. [*Id.*, at p. 10, ¶ 34].

28.    Plaintiff admits he does not know who at Mariano's made the decision to terminate his employment, who was involved in the decision-making process, or what factors or information were considered when making the decision to terminate his employment with the Company:

Q:    [ ]With respect to your specific termination from Mariano's, you did not sit in on the termination discussion that happened in the HR department, correct?

A:    I did not.

Q:    You were simply informed of what the termination decision was, right?

A:    Yes, I was, by Crystal Brandon.

Q:    And so you don't know who specifically at Mariano's actually made the decision to terminate your employment, correct?

A:    That is correct.

Q:    And you don't know who specifically was involved in the decision-making process that led to your termination at Mariano's, correct?

A:    That is correct.

Q:    And because you didn't participate in that discussion, you don't know specifically what factors they considered when reaching their termination decision, correct?

A:    Reiterate that question.

Q:    Sure. Because you didn't participate in that discussion, you don't know what sort of factors were considered or discussed during the decision-making process, which resulted in your termination, right?

A:    I was notified that it was the criminal background.

Q:    Understood. And all you know is what you were told, correct?

A:    By Crystal Brandon.

> Q:    Is that correct?
>
> A:    That is correct.

[**APP'X @ A:** Pl. Dep. Tr., p. 92, line 14 – p. 93, line 24].

29.    Plaintiff's last day of employment at Mariano's was March 15, 2022, the date of his termination.  [**APP'X @ A-16:** L. Flesher Decl. at p. 6, ¶ 14; *see also*, **APP'X @ A:** Pl. Dep. Tr., p. 83, line 24 – p. 84, line 5].

### E.  PLAINTIFF WAS TREATED NO DIFFERENTLY THAN ANY OTHER EMPLOYEE WITH A CRIMINAL CONVICTION RECORD INVOLVING A CRIME OF DISHONESTY

30.    Plaintiff self-identifies his race as "American," his color as "black," and his national origin as "American."  More specifically:

> Q:    [ ] And so what, specifically, is your race?
>
> A:    I'm an American.
>
> Q:    Okay.
>
> A:    I was born here in America. I've never been anything else but that.
>
> Q:    And what, specifically, for the record, is your color?
>
> A:    I'm a black man. That's what I consider myself. Always be considered a black American man.
>
> Q:    And then your national origin is American?
>
> A:    That's my national origin, yes. And I made that understood at that times.
>
> Q:    And with what sex do you identify?
>
> A:    I'm a man, a male.

[**APP'X @ A:** Pl. Dep. Tr., p. 25, lines 1-16].

31.    When making the decision to terminate Plaintiff's employment based on his reported criminal conviction history for a crime of dishonesty, Lindsay Flesher did not treat

Plaintiff any differently than other, similarly-situated employees at the Company before him – specifically: (i) ██████████; (ii) ████████████; (iii) ████████; and (iv) ████████████. [**APP'X @ A-16:** L. Flesher Decl. at p. 8, ¶ 25].

          **(I).** ████████████

32.    On October 18, 2021, ████████████ accepted an offer of conditional employment at Mariano's, subject to her satisfactory completion of a criminal background check. [**APP'X @ A-16:** L. Flesher Decl. at p. 8, ¶ 26].

33.    On or about December 15, 2021, Mariano's received a background check report that revealed Ms. ████████ had been convicted of a crime of dishonesty – specifically, "Robbery." [*Id.*].

34.    Based solely on Ms. ████████ criminal background history, Lindsay Flesher determined that continuing her employment would involve an unreasonable risk to property at Mariano's; accordingly, on December 27, 2021, Ms. Flesher made the decision to terminate Ms. ████████ employment with the Company. [*Id.*].

35.    According to the EEO-1 voluntary disclosure information provided to Mariano's, Ms. ████████ self-identified her race as "White." [*Id.*, at ¶ 27].

36.    Neither Ms. ████████ race, nor her color, nor her national origin played any role whatsoever in Lindsay Flesher's decision to terminate her employment at Mariano's. [*Id.*, at p. 10, ¶ 34].

          **(II).** ████████████

37.    On November 18, 2021, ████████████ accepted an offer of conditional employment at Mariano's, subject to his satisfactory completion of a criminal background check. [**APP'X @ A-16:** L. Flesher Decl. at p. 8, ¶ 28].

38. On or about December 2, 2021, the Company received a background check report that revealed Mr. ███████ had been convicted of a crime of dishonesty – specifically, "Retail Theft." [*Id.*, at pp. 8-9, ¶ 28].

39. Based solely on Mr. ███████ criminal background history, Lindsay Flesher determined that continuing Mr. ███████ employment would involve an unreasonable risk to property at Mariano's; accordingly, on December 13, 2021, Ms. Flesher made the decision to terminate Mr. ███████ employment with the Company. [*Id.*, at p. 9, ¶ 28].

40. According to the EEO-1 voluntary disclosure information provided to Mariano's by Mr. Czerwin, he self-identified his race as "Two or more races." [*Id.*, ¶ 29].

41. Neither Mr. ███████ race, nor his color, nor his national origin played any role whatsoever in Lindsay Flesher's decision to terminate his employment at Mariano's. [*Id.*, at p. 10, ¶ 34].

      **(III).** ███████

42. On November 30, 2021, ███████ accepted an offer of conditional employment at Mariano's, subject to her satisfactory completion of a criminal background check. [**APP'X @ A-16:** L. Flesher Decl. at p. 9, ¶ 30].

43. On or about December 7, 2021, the Company received a background check report that revealed Ms. ███ had been convicted of a crime of dishonesty – specifically, "Retail Theft." [*Id.*].

44. Based solely on Ms. ███████ criminal background history, Lindsay Flesher determined that continuing Ms. ███████ employment would involve an unreasonable risk to property at Mariano's; accordingly, on December 16, 2021, Ms. Flesher made the decision to terminate Ms. ███████ employment with the Company. [*Id.*].

45.     According to the EEO-1 voluntary disclosure information provided to Mariano's by Ms. █████, she self-identified her ethnicity as "Hispanic or Latino." [*Id.*, at p. 10, ¶ 31].

46.     Neither Ms. █████ race, nor her color, nor her national origin played any role whatsoever in Lindsay Flesher's decision to terminate her employment at Mariano's. [*Id.*, at ¶ 34].

**(IV).**     █████████████

47.     On November 12, 2021, █████████████ accepted an offer of conditional employment at Mariano's, subject to his satisfactory completion of a criminal background check. [**APP'X @ A-16:** L. Flesher Decl. at p. 10, ¶ 32].

48.     On or about January 5, 2022, the Company received a background check report that revealed Mr. █████ had been convicted of a crime of dishonesty – specifically, "Forgery/Issue/Delivery Document" and "Theft of Labor or Services."  [*Id.*].

49.     Based solely on Mr. █████ criminal background history, Lindsay Flesher determined that continuing his employment would involve an unreasonable risk to property and, on January 15, 2022, she made the decision to terminate Mr. █████ employment. [*Id.*].

50.     According to the EEO-1 voluntary disclosure information provided to Mariano's by Mr. █████, he self-identified his race as "American Indian or Alaska Native." [*Id.*, at ¶ 33].

51.     Neither Mr. █████ race, nor his color, nor his national origin played any role whatsoever in Lindsay Flesher's decision to terminate his employment at Mariano's. [*Id.*, at ¶ 34].

**(V).  PLAINTIFF CANNOT IDENTIFY *ANY* SIMILARLY-SITUATED COMPARATORS**

52.     Plaintiff admits that he is not aware of the race, color, national origin, or criminal conviction history of Ms. █████████, Mr. ███████, Ms. ████, or Mr. ██████. [**APP'X @ A:** Pl. Dep. Tr., p. 94, line 1 – p. 95, line 19].

53.    Plaintiff also admits that he is not aware of any of the facts or circumstances surrounding the employment, or termination of employment, of Ms. ███████, Mr. ██████, Ms. ████, or Mr. █████ by Mariano's:

> Q:    Have you ever seen any sort of the employment records for any of these four individuals?
>
> A:    I have not that either.
>
> Q:    [I]f they worked at Mariano's, do you know anything at all about the facts and circumstances surrounding their employment or the termination of their employment?
>
> A:    That, I do not have a notice of either. I don't know anything about them that I can think of on that.

[**APP'X @ A:** Pl. Dep. Tr., p. 95, line 20 – p. 96, line 6].

54.    Plaintiff further admits that he cannot identify any Mariano's employee whose criminal background check revealed a prior conviction involving a crime of dishonesty, but who was not terminated as a result:

> Q:    And can you identify any Mariano's employee whose background checks revealed a prior conviction involving the same type of crime for which you were convicted but who wasn't terminated as a result?
>
> A:    That, I cannot even possess a knowledge about because I just did not discuss people's – you know, I was not even discussed to about someone else's prior priorities at Mariano's about their, you know, their – their privacy, rather, put it like that.

[**APP'X @ A:** Pl. Dep. Tr., p. 96, lines 7-17].

### F.   PLAINTIFF'S "HOSTILE WORK ENVIRONMENT" CLAIM

55.    Plaintiff testified that Crystal Brandon, the PSM at Store No. 512, "made certain lewd comments about [him]." Specifically, Plaintiff stated that he once overheard Ms. Brandon say to another employee, "We have a new hire. His name is Brandon Kimble. Beautiful skin. I

would fuck him. I wonder if he got a big dick or not. And he is working in the meat/deli department." [**App'x @ A:** Pl. Dep. Tr., p. 18, lines 1-5, p. 100, line 17 – p. 101, line 10].

56.     According to Plaintiff, he overheard Ms. Brandon make this single lewd comment about him on his first day of work, February 8, 2022. [*Id.*, at p. 101, lines 9-22].

57.     Plaintiff also testified that he was the subject of "gossip" regarding his national origin, and whether he used drugs or alcohol:

> Q:   Any other claims that you have against Mariano's in this lawsuit?
>
> A:   I was also being gossiped [sic] around the store about my national origin. And as well – there was a false narrative and obstruction of justice against the law by Mariano's claiming that I was under a drug usage or alcohol usage, which are – that's a total lie.

[*Id.*, at p. 18, lines 16-23].

58.     Plaintiff testified that he was informed about this purported "gossip" by three (3) customers, and employees in a variety of departments – however, Plaintiff was unable to identify any of these people by name.  [*Id.*, at p. 18, line 24 – p. 24, line 21].

59.     Plaintiff testified that his supervisor at Mariano's was "Dominque Peyton," and further admitted that he has no information regarding the scope of authority of a PSM, or the ability of a PSM to fire, discipline, promote, demote, or otherwise affect any of the terms and conditions of his employment:

> Q:   And your supervisor in the meat and seafood department at Store 512 was Dominque Peyton; is that correct?
>
> A:   That's correct.
>
> *        *        *
>
> Q:   Okay. You never worked in management at Mariano's, correct?

16

A:   No, I did not.

Q:   And you never worked in human resources at Mariano's, correct?

A:   That's correct.

Q:   And you were never a PSM at Mariano's, correct?

A:   No, I was not.

Q:   And so as you sit here today, you don't know the scope or the authority or the ability of a PSM to discipline or promote, demote, or make any sort of decisions with respect to an hourly employee's employment, right?

A:   Not at Mariano's, I don't.

Q:   And you've never fired anyone yourself, correct?

A:   Not at Mariano's, I have not.

Q:   And you've never participated in any decision to fire another employee at Mariano's, correct?

A:   That is correct.

[**APP'X @ A:** Pl. Dep. Tr., p. 70, lines 7-10; p. 91, line 16 – p. 92, line 13].

60.     At no point did Ms. Brandon ever have any supervisory authority over Plaintiff; in her capacity as PSM, Ms. Brandon had no authority or ability to discipline, suspend, terminate, promote, demote, increase or decrease the rate of pay, or take any other tangible employment action against Plaintiff.  [**APP'X @ A-16:** L. Flesher Decl. at p. 11, ¶ 36].

61.     Rather, the only people at Store No. 512 who had the authority or ability to affect the day-to-day conditions of Plaintiff's employment were: (a) Ms. Peyton; (b) the Store Director, Zaim Vukic; or (c) the Co-Manager, Reginald Watson.  [*Id.*, at ¶ 35].

62.     In addition to its equal employment opportunity policy, Mariano's maintains a robust, written policy against sexual and other workplace harassment (the "anti-harassment policy" or "policy"), which is clearly set forth in the Company's Employee Handbook, a copy of which is

provided to and/or made available to every newly-hired employee – including Plaintiff. [**APP'X @ A-16:** L. Flesher Decl. at p. 4, ¶ 8; *see also,* **APP'X @ A-16, Ex. B:** L. Flesher Decl. Ex. B, Employee Handbook, at "D000012" and "D000021-22;" **APP'X @ A:** Pl. Dep. Tr., p. 75, line 21 – p. 76, line 16 (confirming that Deposition Exhibit 10 is a copy of the Employee Handbook that Plaintiff reviewed and acknowledged during his orientation training at Mariano's)].

63.      Through its anti-harassment policy, Mariano's provides a clear definition of unlawful harassment (which includes harassment based on someone's race or national origin) along with specific examples of unacceptable workplace conduct:

**Should You Encounter Harassment**

We are committed to providing a professional work environment where individuals are treated with courtesy, respect and dignity. As part of this commitment, the company will not tolerate any form of harassment, verbal, written, or physical, with regard to any individual's sex, sexual orientation or gender identity, race, religion, national origin, disability, age, or other similar personal characteristic.

Harassment may take the form of a single incident or a pattern of behaviors. Either way, the defining quality of harassment is that its purpose or effect is to create a hostile, offensive or intimidating work environment, or to otherwise affect the terms and conditions of someone's employment. Some examples of harassment include (but are not limited to):

- Derogatory racial, ethnic, religious, age, or gender-based, including sexually-oriented or explicit, jokes, comments, language, materials or actions;
- Unwelcome sexual advances or unwelcome physical contact such as touching, pinching, brushing against another's body or coerced sexual intercourse or contact;
- Requests for sexual "favors", particularly when such a request is used as a condition of employment or as the basis for employment decisions such as hiring, promotion or compensation.

[**APP'X @ A-16, Ex. B:** L. Flesher Decl. Ex. B, Employee Handbook, at "D000021-22" (emphasis added); *see also*, **APP'X @ A-10:** Pl. Dep. Ex. 10, at "D000021-22;" **APP'X @ A-16:** L. Flesher Decl., at pp. 13-14, ¶ 48 (establishing evidentiary foundation of Employee Handbook as a "business record[] of Mariano's that [was] created on or about the date identified on the respective document from information transmitted by persons with knowledge, and [was] created, kept and maintained in the course and as part of the regular practice of the Company's regularly-conducted business activities.")].

64.     Mariano's policy further mandates that employees have an obligation to immediately report any type of misconduct, and advises that the Company will promptly investigate all reports of harassment and other discrimination:

> What to do if You Encounter Harassment
> No employee should tolerate harassment, whether directed at oneself or another employee. Communicating with an individual whose behavior you feel is offending you can have a positive effect if you are comfortable doing so. If you encounter harassment, you should report it immediately to the Vice President of Area Operations or to the Group Vice President, Chief Human Resource Officer, who has the ultimate responsibility for investigating, or arranging for an appropriate investigation, and taking appropriate action. Please call the Human Resources Department at 414-231-5000 or the Roundy's ReportLine at 1-800-880-9016 to report any harassment.
>
> All complaints of any kind will be reported to the Group Vice President, Chief Human Resource Officer and investigated immediately. Swift and appropriate action will be taken to stop and remedy the harassment, including disciplinary action against any employee found in violation of this policy, up to and including discharge.
>
> The investigation will be handled confidentially. The company also prohibits retaliation against any individual for reporting harassment, or for participating in the investigation of a harassment complaint, but takes knowingly false claims of harassment very seriously.

[**APP'X @ A-16, Ex. B:** L. Flesher Decl. Ex. B, Employee Handbook, at "D000022"].

65.     In order to further promote and encourage the reporting of workplace misconduct, the Company's policy includes a multi-faceted "reporting and investigation procedure," which provides several different reporting options for an employee who believes they have experienced workplace harassment, including reporting the incident to "the Human Resources Department or any corporate executive they may know or wish to select," or anonymously through the Company's toll-free ethics hotline. [*Id.*].

66.     Mariano's policy further mandates that any complaints will be "investigated immediately," and "swift and appropriate" remedial measures will be taken, including disciplinary action up to and including discharge. [*Id.*].

67.     Finally, Mariano's expressly prohibits retaliation against any employee who makes a complaint or participates in the investigation of one. [*Id.*].

68.     Despite having received and reviewed a copy of Mariano's Employee Handbook – including the Company's anti-harassment policy contained therein – Plaintiff testified that he never reported Ms. Brandon's comments to Mariano's until he wrote a letter to "Kroger HR" on March 15, 2022, after his employment had already been terminated:

> Q:   And I'm handing you what I'm marking as Deposition Exhibit 15. And this is a copy of the letter that you sent to Mariano's after your employment was terminated, correct?
>
> (Rudolph-Kimble Deposition Exhibit 15 marked for identification and attached to the transcript.)
>
> A:   Yes, I did. I actually – I did this myself. Yes, I did.
>
> Q:   And you sent this letter to Kroger's human resources department headquarters and executive team, correct?
>
> A:   Yes, I did.
>
> Q:   And you sent it to Kroger's HR department because you understand that Kroger owned Mariano's?
>
> A:   Yeah. Yes. Excuse my language.
>
> Q:   And in this five-page letter, you let Kroger's HR department know of all the various problems that you experienced during the course of your employment at Mariano's, right?
>
> A:   Roughly so.
>
> Q:   I mean, you talk about the discrimination that you experienced, right?
>
> A:   Yes.
>
> Q:   You talk about the harassment that you experienced, right?
>
> A:   Yes.
>
> Q:   You talk about your request for a promotion, right?
>
> A:   Yes.

*        *        *

Q:     And then you write in your letter here that you did not report –

**A:     I did not report it –**

Q:     – you didn't report the comment that –

A:     It was an orientation day. I'm trying to keep a job.

Q:     All right. So just so the record is clear and we're not talking over each other, it is correct to say that you never reported the comments that you heard Ms. Brandon make on February 8, 2022, correct?

**A:     I never reported that. That's correct.**

[**App'x @ A:** Pl. Dep. Tr., p. 97, line 15 – p. 105, line 18 (emphasis added); *see also,* **App'x @ A-15:** Pl. Dep. Ex. 15; **App'x @ A-16, Ex. P:** L. Flesher Decl. Ex. P; **App'x @ A-16:** L. Flesher Decl. at ¶¶ 38, 48 (confirming "the first time Plaintiff ever provided any notice to anyone at Mariano's regarding any of the matters alleged in his Complaint, was ***after*** his employment had already been terminated," and authenticating Exhibit P as a business record of Mariano's) (emphasis original)].

69.     After receiving Plaintiff's post-employment demand letter (Pl. Dep. Ex. 15), Mariano's immediately began, and promptly conducted, a thorough investigation of the issues raised in his letter, and concluded that each and every one of his allegations was factually without merit.  [**App'x @ A-16:** L. Flesher Decl. at pp. 11-12, ¶ 39].

70.     The only other complaint that Plaintiff made to Mariano's was the grievance that he filed with his Union under the CBA, which Plaintiff submitted on March 22, 2022 – after his employment had already been terminated.  [**App'x @ A-16:** L. Flesher Decl. at p. 12, ¶ 40; *see also,* **App'x @ A:** Pl. Dep. Tr., p. 96, line 18 – p. 97, line 9 (affirming that Plaintiff filed his grievance with the Union after his employment had already been terminated); **App'x @ A-14** and **App'x @ A-16, Ex. R:** Plaintiff's March 22, 2022, grievance with UFCW; **App'x @ A-16:** L.

Flesher Decl. at pp. 13-14, ¶ 48 (establishing Plaintiff's union grievance ("Exhibit R" to declaration) is business record of Mariano's)].

71.    Plaintiff's Union grievance makes no mention of any lewd comment by Ms. Brandon, or any "gossip," or any conduct at Store No. 512; instead, Plaintiff states *only* "that he was terminated on 3/15/2022 for an alleged violation of company policy."  Specifically:

> As we on 3/18/2022, this grievance is being filed at Mr. Rudolph-Kimble's request. Mr. Rudolph-Kimble states that he was terminated on 3/15/2022, for an alleged violation of company policy. Therefore, it is Local 881's position that Mr. Rudolph-Kimble be reinstated immediately and made whole, as it pertains to all contractual benefits, to include full retro pay. Likewise, Local 881 requests that this discipline be removed from Mr. Rudolph-Kimble's file. Further, please forward all copies of all documentation used to administer this discipline to Local 881, at your earliest convenience. Please notify Local 881 as to the date Mr. Rudolph-Kimble is returned to work, as well as the amount and date of retro payment.
>
> Thank you,
> Markeisha Marshall
> Union Representative
>
> Cc: Lindsay Flesher, Hay Joosten

[**APP'X @ A-16, Ex. R** (emphasis added)].

### G.  PLAINTIFF'S "RETALIATION" CLAIM

72.    For his employment retaliation claim, Plaintiff alleges that Mariano's retaliated against him – and terminated his employment – because he sought a promotion:

> Q:    And you also allege that Mariano's retaliated against you for seeking a promotion, correct?
>
> A:    Yes.
>
> Q:    And the adverse employment action that you claim you suffered here was that your employment was terminated, correct?
>
> A:    Yes.

[**APP'X @ A:** Pl. Dep. Tr., p. 16, line 20 – p. 17, line 3].

73.    Plaintiff was employed as an hourly employee at Mariano's – specifically, as a "Level 3" team member assigned to the Meat Department at Store No. 512, which was the only position that he ever held at Mariano's:

Q:     And you never held any other position other than the level 3 position in the meat and seafood department at Store 512, correct?

A:     That's correct. And another thing, it was supposed to be full -- it was full-time. We had a full-time agreement, starting as full-time.

Q:     Okay. And so it was a full-time job that you had at Mariano's, right?

A:     Yes, it was.

Q:     All right. And, again, the only position you ever held at Mariano's was a level 3 team member in the meat and seafood department at Store 512, correct?

A:     That is correct.

                    *        *        *

Q:     And it was a full-time position but it was also an hourly position, correct?

A:     Yes. That is correct.

[**APP'X @ A:** Pl. Dep. Tr., p. 69, line 17 – p. 71, line 4].

74.     During the tenure of Plaintiff's employment at Mariano's, hourly store employees were classified into various "Levels" based upon their knowledge, training and skill level; under the Company's Level-System, a team member's responsibilities became greater at each higher level (for example, a "Level 1" team member would have a lower skill set and less responsibilities than a "Level 3" team member; and the highest level of certification available to an hourly employee at Mariano's was "Level 4."). [**APP'X @ A-16:** L. Flesher Decl. at p. 12, ¶¶ 42-43; *see also*, **APP'X @ A:** Pl. Dep. Tr., p. 77, lines 4-23 (affirming that Deposition Exhibit 11 accurately summarized the duties and requirements for the various levels of hourly employees at Mariano's); **APP'X @ A-16:** L. Flesher Decl. at pp. 13-14, ¶ 48 (establishing that Deposition Exhibit 11,

"D000094.001" (also attached as "Exhibit S" to Ms. Flesher's Declaration) is a business record of Mariano's)].

75.     In order to become certified as a "Level 4" employee, Plaintiff would have been required to first become "cross-trained" as a Level 3 employee in another department; however, Plaintiff neither requested, nor obtained, any certification training required to "level-up" to a Level 4 position.  [**APP'X @ A-16:** L. Flesher Decl. at pp. 12-13, ¶ 44].

76.     Moreover, even if Plaintiff would have become cross-trained as a Level 3 employee in another department, and even if he would have completed the entire certification requirement to become a Level 4 employee, Plaintiff never submitted the Company Internal Applicant Form required under Section 7 of Article 4 of Mariano's Collective Bargaining Agreement ("CBA") with the United Food & Commercial Workers ("UFCW") Local No. 881.  [**APP'X @ A-16:** L. Flesher Decl. at p. 13, ¶ 45; *see also*, *Id.*, at p. 3, ¶¶ 6-7 (the terms and conditions of employment for Mariano's hourly store employees are subject to the CBA)].

77.     Furthermore, under Mariano's Level System, after an employee obtains a certain level certification and submits the required application form, the employee will be promoted if – but not until – that level position becomes available in the requested department (thus, for example, an employee who becomes certified as a "Level 4" employee would be eligible for promotion to a Level 4 position in the Meat Department if – but not until – the Meat Department experiences an open staffing opportunity for that position).  [**APP'X @ A-16:** L. Flesher Decl. at p. 13, ¶ 46].

78.     In this case, the Meat Department at Store No. 512 never experienced an open staffing opportunity for a "Level 4" employee at any point during the time period of Plaintiff's employment; thus, even if Plaintiff had obtained the required certification to become a Level 4 employee (and, he did not), and even if Plaintiff had submitted an application form (and, he did

not), he could not have been promoted because there were no open Level 4 positions in the Meat Department at Store No. 512. [*Id.*, at ¶ 47].

79.    When making her decision to terminate Plaintiff's employment, Lindsay Flesher was not aware of any facts that would suggest that he had requested or applied for any type of promotion or certification; she did not learn about Plaintiff's allegations concerning a requested promotion or certification until he wrote to the Company's HR Department *after* his employment had already been terminated. [*Id.*, at p. 7, ¶ 24 (emphasis original)].

Dated: April 28, 2023                          Respectfully submitted,

                                               **ROUNDY'S ILLINOIS, LLC, d/b/a**
                                               **MARIANO'S, Defendant**

                                               By: */s/ Christopher S. Griesmeyer*
                                                     One of Its Attorneys

                                               Christopher S. Griesmeyer (ARDC No. 6269851)
                                               GREIMAN, ROME & GRIESMEYER, LLC
                                               205 West Randolph Street, Suite 2300
                                               Chicago, Illinois 60606
                                               Telephone: (312) 428-2750
                                               Facsimile: (312) 332-2781
                                               cgriesmeyer@grglegal.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 28, 2023, a copy of the foregoing Defendant's ***Rule 56(c)(1) Separate Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment,*** was filed with the Court's CM/ECF system, which will provide notice to all counsel of record registered to receive notices. I further certify that a copy of the foregoing has been sent to the Plaintiff at the addresses listed below via U.S. Mail, before the hour of 5:00pm, on April 28, 2023:

<table>
<tr>
<td>Brandon Rudolph-Kimble<br>211 East Delaware Place<br>Unit No. 206<br>Chicago, Illinois 60611</td>
<td>&</td>
<td>Brandon Rudolph-Kimble<br>1600 N. Milwaukee Ave.<br>Vernon Hills, Illinois 60061</td>
</tr>
</table>

*/s/ Christopher S. Griesmeyer*
Christopher S. Griesmeyer
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Telephone: (312) 428-2750
Facsimile: (312) 332-2781
cgriesmeyer@grglegal.com